**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SCHENECTADY INDUSTRIAL**
**CORPORATION,**

                  **Plaintiff,**          **1:06-cv-1493**
                                       **(GLS/DRH)**

        **v.**

**UPSTATE TEXTILES, INC.** and
**SAFER EQUIPMENT CORP.,**

                  **Defendants.**
_____

**APPEARANCES:**                **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Deily, Mooney Law Firm        DOUGLAS J. ROSE, ESQ.
8 Thurlow Terrace           RICHARD C. MAIDER, ESQ.
Albany, NY 12203-1006

**FOR THE DEFENDANTS:**
Office of Philip D. Neuer, P.C.    PHILIP D. NEUER, ESQ.
1875 McCarter Highway
Newark, NJ 07104

Bennett, Giuliano Law Firm     JEFFREY R. KRANTZ, ESQ.
225 West 34th Street
Suite 402
New York, NY 10122

**Gary L. Sharpe**
**District Court Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff Schenectady Industrial Corporation (SIC) brought this action against Upstate Textiles, Inc. (Upstate) and Safer Equipment Corp. (Safer) to recover compensation for the use and occupation of SIC's buildings under New York Real Property Law and common law, and for the removal and cleanup of hazardous and petroleum-based substances under CERCLA[1] and New York Navigation Law.  (*See* Am. Compl., Dkt. No. 66.) Pending are SIC's motion for summary judgment, (Dkt. No. 72), and Upstate and Safer's cross-motion for summary judgment and sanctions, (Dkt. No. 83).  For the reasons that follow, SIC's motion for summary judgment is denied, Upstate and Safer's cross-motion for summary judgment is granted in part and denied in part, and all parties' motions for sanctions are denied.

## II. Background

## A. Factual History

SIC, a New York corporation, initially instituted suit against Upstate

_____

[1]Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, *et seq.*

and Safer, both New Jersey corporations, and CommerceWest Bank, a federally chartered institution with its principal place of business in California.  (*See* Compl. ¶¶ 1-4, Dkt. No. 1.)  Beginning in May 1994, SIC leased several of its industrial and commercial buildings located on Nott Street in Schenectady, New York, to Twin Rivers Textile Printing & Finishing.  (*See* Am. Compl. ¶¶ 1, 9, Dkt. No. 66.)  Twin Rivers became a subsidiary of Guilford Mills, Inc., which subsequently filed for Chapter 11 bankruptcy.  (*See id.* at ¶¶ 10-11.)  Twin Rivers' assets were thereafter sold to Greenblatt & Co.  (*See id.* at ¶ 12.)

CommerceWest extended credit to Greenblatt, which was secured by Greenblatt's assets, including Twin Rivers' lease with SIC.  (*See id.* at ¶ 13.)  When Greenblatt defaulted on its obligations, CommerceWest foreclosed on its security interest and took possession of Greenblatt's assets.  (*See id.* at ¶ 15.)  Thereafter, on April 5, 2004, Twin Prints, LLC acquired CommerceWest's interest in Greenblatt's collateral.  (*See id.* at ¶ 17.)  Between July and August 2004, after Twin Prints merged with Mohawk Valley Textiles Printing, LLC, Mohawk assumed the debt obligations Twin Prints owed to CommerceWest and reaffirmed CommerceWest's security interest in its assets, which included the

3

leasehold interest in SIC's Nott Street Buildings.  (*See id.* at ¶¶ 18-19.)

In January 2005, Mohawk defaulted on its obligations to CommerceWest and thereby surrendered its assets, which included the leasehold interest and the inventory and equipment located in the Nott Street Buildings.  (*See* Pl. SMF ¶ 6, Dkt. No. 72:1.)  CommerceWest foreclosed on its security interest and took possession of Mohawk's assets. (*See id.* at ¶ 7.)  And under a Bill of Sale dated February 9, 2005, CommerceWest sold all of its interest in the Mohawk assets to Safer for $300,000.  (*See id.* at ¶ 8.)  The property acquired under the February 9 Bill of Sale was described as "all equipment, chemicals, dyes, supplies and inventory, including but not limited to" a list of itemized machines and equipment.  (*See id.* at ¶ 9 (citing Maider Aff., Ex. A, Dkt. No. 73:1).) Between February 9 and February 21, 2005, Safer occupied the Nott Street Buildings and was the title owner of the property enumerated in the February 9 Bill of Sale.  (*See id.* at ¶¶ 12-13.)  During this period, Safer did not pay SIC rent or any fee for its occupancy.  (*See id.* at ¶ 14.) Immediately thereafter, Safer transferred its interest in the same property referenced in the February 9 Bill of Sale to Upstate for $300,000.  (*See id.* (citing Maider Aff., Ex. B, Dkt. No. 73:1).)

4

On February 21, 2005, Upstate began using and occupying the Nott Street Buildings.  (*See id.* at ¶ 16.)  Prior to its occupancy, Upstate, acting through Philip Neuer as Vice President and General Counsel, made an offer to SIC to enter into a use and occupancy agreement and proposed a $50,000 "lump sum" advance rental payment, which SIC did not accept.[2] (*See id.* at ¶ 17.)  Similar negotiations continued from February through June 2005 between SIC, by its counsel, Jonathan Deily, and Upstate, by Neuer.  (*Id.* at ¶ 18.)  In a March 24, 2005 letter from Neuer to Deily, Neuer acknowledged Upstate's intent to negotiate "an appropriate fee for the use and occupancy for all or parts" of the Nott Street Buildings.  (*See* Buhrmaster Aff., Ex. C, Dkt. No. 72:4.)  Neuer also asserted Upstate's intent to remove all the printing screens and other items stored in the buildings and to "dispose of any of the equipment and inventory which it purchased ... in a manner other than abandonment ...."  (*Id.*)

On April 14, 2005, Deily sent a letter to Neuer proposing rental options for the Nott Street Buildings, which included rent under the terms of

---

[2]Despite Upstate's disingenuous attempt to take advantage of a typographical error in SIC's Statement of Material Facts, (*compare* Def. Resp. SMF ¶ 28, *with* Pl. Reply Mem. of Law at 5 & n.4, Dkt. No. 86), it is clear that the $50,000 offer for use and occupancy was for the period of February 12, 2005, to August 31, 2005.  SIC has not made any suggestion that $50,000 was an appropriate fee for the period of February 2005 to August 2008.

the pre-existing Mohawk lease arrangement at $26,556.81 for March and $27,000 per month from April to August 2005, or rent under a month-to-month tenancy based on the square footage of the buildings actually being occupied.  (*See id.*, Ex. D.)  This letter also notified Upstate that it must enter into an Indemnification and Hold Harmless Agreement, which required, among other things, Upstate to remove all equipment and debris from the buildings and dispose of all debris, trash, and storage drums in accordance with New York regulations at its own expense.  (*See id.*)  Neuer sent a responsive letter on April 29, wherein he questioned the rate SIC was seeking as "substantially above market" and offered to pay $7,500 per month from April to July 2005 while continuing to maintain insurance on the premises.  (*See id.*, Ex. E.)  These sentiments mirrored an earlier letter sent by Neuer to Deily, in which Neuer suggested that the rent should be lowered since Upstate would "not be operating or performing manufacturing activities" during the period of occupancy.  (Neuer Aff., Ex. B, Dkt. No. 84:2.)  However, Neuer stated that Upstate would remove only what it purchased and would be responsible for any damage caused by such removal, but that Upstate "did not purchase the debris and the garbage and the loose chemicals and dyes."  (*See* Buhrmaster Aff., Ex. E,

Dkt. No. 72:4.)  Deily rejected Upstate's offers as "patently unreasonable" and reasserted Upstate's failure to pay rent for March and April despite occupying the space for its use and benefit.  (*Id.*, Ex. F.)  Deily additionally referred to the February 9 Bill of Sale in support of its claim that Upstate was the title owner of all the contents of the Nott Street Buildings.  (*See id.*)  On May 9, Upstate mailed a check to SIC for $20,000 as "a good faith payment against use and occupancy charges" and to demonstrate its desire to "proceed with serious negotiations toward a full and final resolution."  (*Id.*, Ex. G.)

Ultimately, Upstate vacated and surrendered possession of the Nott Street Buildings on August 31 and completed the "final clean-up" on September 1.  (*See id.*, Ex. H.)  In a September 2, 2005 letter, Neuer stated that removal of the remaining property resulted in "neither a spill nor a discharge of hazardous materials."  (*Id.*)  For the period between February 21 and September 1, 2005, Upstate did not pay SIC anything for rent or use and occupancy beyond the $20,000 "good faith payment."  (*See* Pl. SMF ¶ 26, Dkt. No. 72:1.)

On April 8, 2005, Allison Elliott of the New York State Department of Environmental Conservation (DEC) conducted an inspection of the Nott

7

Street Buildings and found hazardous substances present.  (*See id.* ¶ 30;

*see also* Frantzen Aff., Ex. B, Dkt. No. 72:11.)  Elliott prepared a DEC

Inspection Form in which she identified the hazardous substances and

waste located in and around the Nott Street Buildings.  (*See* Frantzen Aff.,

Ex. C, Dkt. No. 72:12.)  Sometime prior to April 2005, SIC hired Kurt

Frantzen,[3] a professional environmental risk management consultant, to

provide advice regarding environmental management issues at the Nott

Street Industrial Park, which included the Nott Street Buildings occupied by

---

[3]Consistent with the court's prior rulings and contrary to defense counsel's contentions, the affidavit of Kurt Frantzen is admissible because his testimony is based on his direct personal knowledge and perception of factual matters at issue here, which is precisely the type of testimony governed by Rule 701 of the Federal Rules of Evidence.  *See generally* 4 WEINSTEIN'S FEDERAL EVIDENCE § 701.03 (2d Ed. 2009); *see also Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995).  In making this determination, the court credits SIC's averments that it designated Frantzen as a witness with knowledge in its Rule 26(a) disclosures, that Frantzen's inspection reports were all produced in discovery, and that Frantzen was not specially retained for purposes of the present litigation as an expert witness.  (*See* Pl. Reply Mem. of Law at 2, Dkt. No. 86.)  These averments are consistent with SIC counsel's statements made before Magistrate Judge David R. Homer on May 6, 2009.  (*See* Krantz Aff., Ex. A, Dkt. No. 84:1.) Insofar as Frantzen's affidavit contains legal conclusions or was not a product of his actual participation and involvement and was instead based on his scientific expertise alone, the court will disregard such testimony.  *See Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004).  Nonetheless, the bulk of Frantzen's testimony is rationally based on his perceptions, is helpful to understanding his testimony and determining facts in issue, and is not rooted solely in his scientific, technical, and other specialized knowledge and expertise.  *See* FED. R. EVID. 701; *see also United States v. Rigas*, 490 F.3d 208, 222-225 (2d Cir. 2007) ("A witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' as long as it was based on his investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise.") (internal quotation marks and citation omitted).  Thus, any "risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing" has been eliminated.  *Rigas*, 490 F.3d at 224 (internal quotation marks and citation omitted).

Upstate and Safer.  (*See* Frantzen Aff. ¶ 4, Dkt. No. 72:9.)  On April 11, Elliott advised Frantzen about the concerns the DEC had regarding the materials, products, and waste present in the Nott Street Buildings and the manner in which Safer and Upstate were dismantling the property located in those buildings.  (*See id.* at ¶ 9.)  The following day, the DEC contacted Frantzen by telephone to discuss Upstate's expected departure from the Nott Street Buildings and to inquire into how Upstate would be handling the chemicals, dyes, pigments, used chemicals, and other waste at the facilities.  (*See id.* at ¶ 10.)  On April 21, the DEC sent a Hazardous Waste Compliance Inspection report to SIC, advising SIC that it was "operating as an occasional generator of hazardous waste" and that SIC was in violation of the New York regulations' requirements to keep proper records regarding storage and disposal of chemical and hazardous materials and waste.  (*See* Frantzen Aff., Ex. C, Dkt. No. 72:12.)

Upon learning about the DEC's concerns, SIC's representatives, George Robertson and Philip Dixon, asked Frantzen to monitor the situation and perform monthly inspections of the Nott Street Buildings. (*See* Frantzen Aff. ¶ 11, Dkt. No. 72:9.)  Pursuant to this request, Frantzen performed inspections on April 28 and May 26, 2005, and orally reported

his findings to Robertson.  (*See id.*)  After an extensive inspection on June

9, 2005, Frantzen filed a report with Robertson disclosing the presence of,

among other things, drums and portable tanks containing adhesives,

solvents, absorbent and other chemicals, dyes, and pigments, some of

which had been released onto and into the ground.  (*See* Frantzen Aff., Ex.

E, Dkt. No. 72:12.)

On June 21, 2005, following the April 21 "warning letter," the DEC

issued a second letter demanding that SIC notify it of the steps to be taken

to identify and prevent the release of hazardous substances, and that SIC

do so within 15 days to avoid enforcement proceedings.  (*See id.*, Ex. F.)

During this period from June to August 2005, Upstate was involved in

decommissioning, disassembling, and removing the property located in the

Nott Street Buildings.  (*See* Def. Resp. SMF ¶ 34, Dkt. No. 84:3.)  Upstate

collected and safeguarded various containers, tanks, and drums of

chemicals and waste, and then staged them at certain locations in the Nott

Street Buildings.  (*See id.* at ¶ 38.)  However, in pointing to a letter sent to

Deily by Neuer on February 28, 2005, Upstate contends that this was done

"as a courtesy to [SIC]" and was "not exercis[ing] dominion or control but

[was] merely consolidating this area so that spillage and leakage [would]

not occur and to facilitate [SIC's] analysis ... as a courtesy and at no cost to [SIC]."  (Neuer Aff., Ex. B, Dkt. No. 84:2.)

On August 25, 2005, after performing an inspection, Frantzen sent Robertson, Dixon, and Deily a memorandum in which he detailed his findings, which included: (1) "noticeable discrete (limited) releases of oil, grease, pigment, and other powders and material"; (2) at least 20 to 25 50-gallon tanks of pigments, dyes, or chemicals that had been drained but not cleaned; (3) at least 230 55-gallon drums containing pigments, waste oil, cleaners, and other chemical compounds and solvents; (4) several open barrels with "possible pigments or other chemicals in them"; (5) various other containers containing cleaning agents, solvents, and other chemicals; (6) at least a dozen 330-gallon sealed carboys that may or may not have contained various chemicals; and (7) green pigment stains in the soil surrounding the buildings.  (Frantzen Aff., Ex. G, Dkt. No. 72:12.)  In this memo, Frantzen also noted the presence of several workers who identified Brian Winning, of Safer, as the individual responsible for decommissioning and cleaning up the site.  (*See id.*)  On the same day, August 25, Neuer sent a letter on behalf of Upstate to SIC stating that although Upstate did not generate any of the substances located at the Nott Street Building site,

11

it did "drain[] the oil from the machinery before having it dismantled ... [and] safed [the oil] in a two hundred (200) gallon tote bin."  (Pl. Mem. of Law, Ex. B, Dkt. No. 86.)

On September 2, 2005, pursuant to an inspection conducted on August 23, the DEC sent a letter to SIC advising that hazardous wastes were abandoned at the facility in violation of New York law and that penalties may be assessed against all entities or persons who are determined to be responsible.  (*See* Frantzen Aff., Ex. H, Dkt. No. 72:12.)

On September 7, 2005, following Upstate's departure, Frantzen inspected the facilities and noticed "releases of oil, grease, pigment, and other powders and material resulting from the disassembly activities." (Frantzen Aff., Ex. I, Dkt. No. 72:13.)  Moreover, the conditions that Frantzen listed in his August 25 memo were "generally unchanged," for there still remained hundreds of chemical-filled drums, carboys, tanks, and barrels throughout the buildings.  (*Id.*)  Accordingly, Frantzen and SIC prepared a comprehensive plan to identify, segregate, handle, clean up, transport, and dispose of the hazardous waste materials.  (*See* Frantzen Aff. ¶ 22, Dkt. No. 72:9; *see also* Frantzen Aff., Exs. J, L, Dkt. No. 72:13.) In accordance with this plan, and in order to cure several New York

regulatory violations, SIC hired a series of contractors to clean up the site

and remove and dispose of the hazardous substances located at the Nott

Street Buildings.[4]  (*See* Buhrmaster Aff. ¶ 41-44, Dkt. No. 72:3.)  And on

October 19, 2006, after a final inspection, the DEC notified SIC that "all of

the hazardous wastes [located in and around the Nott Street Buildings]

ha[d] been removed, and [that SIC] provided documentation of their proper

disposal."  (Frantzen Aff., Ex. M, Dkt. No. 72:13.)

## B.   Procedural History

On December 13, 2006, SIC filed an action in the United States

District Court for the Northern District of New York based on diversity

jurisdiction under 28 U.S.C. § 1332(a)(1).  (*See* Compl., Dkt. No. 1.)

CommerceWest was dismissed from the action pursuant to a

Memorandum-Decision and Order issued by this court on November 24,

2008.  (*See* Dkt. No. 65.)  In accordance with the same Order, SIC

amended its complaint to assert claims against Upstate and Safer under

N.Y. REAL PROP. LAW § 220 and New York common law, based on their use

and occupancy of SIC's buildings, and under CERCLA and N.Y. NAV. LAW

---

[4]According to SIC, and based on invoices and records it has provided, the total cost of
the cleanup and disposal was $141,024.08.  (*See* Buhrmaster Aff., Ex. K, Dkt. No. 72:5.)

§§ 176(8) and 181(5), seeking compensation for the costs incurred in the cleanup and removal of hazardous and petroleum-based substances from the Nott Street Buildings.  (*See* Am. Compl., Dkt. No. 66.)  SIC also raised a claim for private nuisance based on Upstate and Safer's intentional, unreasonable, and negligent misconduct.  (*See id.* at ¶¶ 59-64.)  On May 21, 2009, SIC moved for summary judgment on its claims against Upstate and Safer.  (*See* Dkt. No. 72.)  In response, Upstate and Safer moved for summary judgment on all of SIC's claims, including dismissal of the Navigation Law and CERCLA claims for failing to state a claim upon which relief could be granted.  (*See* Dkt. Nos. 83-85.)  Also contained within this motion was Upstate and Safer's request for sanctions under Rule 11 of the Federal Rules of Civil Procedure.  (*See id.*)

### III.  <u>Standards of Review</u>

The standards for dismissal pursuant to FED. R. CIV. P. 12(b)(6) and for summary judgment under FED. R. CIV. P. 56 are well established, and will not be repeated here.  For a full discussion of the standards, the court refers the parties to its previous opinions in *Dixon v. Albany County Bd. of Elections*, No. 1:08-CV-502, 2008 WL 4238708, at *2 (N.D.N.Y. Sept. 8, 2008) (Rule 12(b)(6)); and *Bain v. Town of Argyle*, 499 F. Supp.2d 192,

194-95 (N.D.N.Y. 2007) (Rule 56).

## IV. **Discussion**

## A.    **Use and Occupancy and Unjust Enrichment**

Under N.Y. REAL PROP. LAW § 220, a landlord may "recover a reasonable compensation for the use and occupation of real property." *See, e.g.*, *N.Y. State Teachers' Ret. Sys. v. Huberty*, 48 A.D.2d 741, 742 (3d Dep't 1975).  A landlord's entitlement to receive and an occupant's obligation to pay a reasonable fee for use and occupancy is not contingent on an underlying contract.  *See Eighteen Assocs., LLC v. Nanjim*, 257 A.D.2d 559, 559 (2d Dep't 1999) (citations omitted).  "Rather, an occupant's duty to pay the landlord for its use and occupancy of the premises is predicated upon the theory of quantum meruit, and is imposed by law for the purpose of bringing about justice without reference to the intention of the parties."  *Id.* at 559-560 (internal quotation marks and citation omitted).  To make out a claim in quantum meruit—i.e., quasi-contract—the landlord must establish good faith performance of services and expectation of compensation, and acceptance by the occupant of those services.  *See Landcom, Inc. v. Galen-Lyons Joint Landfill Comm'n*, 259 A.D.2d 967, 968 (4th Dep't 1999).  The landlord must also establish

15

the reasonable value of the services.  *See id.*  Similarly, unjust enrichment

requires the landlord to demonstrate that the occupant retained a benefit

that it should not have obtained in equity and good conscience.  *See Parsa*

*v. New York*, 64 N.Y.2d 143, 148 (N.Y. 1984); *see also Paramount Film*

*Distrib. Corp. v. New York*, 30 N.Y.2d 415, 421 (N.Y. 1972); *Mente v.*

*Wenzel*, 178 A.D.2d 705, 706 (3d Dep't 1991).

There is no dispute that Safer occupied the Nott Street Buildings from

February 9 to February 21, 2005, without paying any rent or fees.  It is also

undisputed that Upstate occupied the same buildings from February 21 to

September 1, 2005.  And while there is no dispute that Upstate provided

SIC with $20,000 as a good faith payment for its use and occupancy of the

Nott Street Buildings, there is an ardent dispute as to whether Upstate

owes SIC any further payment and, if so, what amount Upstate owes for its

use and occupancy of the Nott Street Buildings.  The "what amount"

question is similarly disputed by Safer.

With these issues in mind, the court first concludes that SIC is

entitled to a reasonable compensation for Safer and Upstate's use and

occupation of the Nott Street Buildings.  SIC has abundantly demonstrated

that it provided Safer and Upstate with full access, occupancy, and use of

its facilities with the expectation of compensation.  And Safer and Upstate

accepted and retained these services, which should not have been

obtained in equity and good conscience without adequate compensation.

However, the dispute remains as to what constitutes a reasonable

amount.  SIC claims it is entitled to $5,670.20 from Safer and $75,325.80

from Upstate.  Safer and Upstate challenge the manner in which these

amounts were calculated, based on, among other things, the fact that they

were merely using the site for storage and disassembly, and were not

operating the equipment or performing any other type of manufacturing

activities at the facility during the period in question.[5]  Therefore, because

the manner in which Safer and Upstate used the Nott Street Buildings, the

amount of compensation SIC is entitled to, and the method by which the

compensation should be calculated present questions that cannot be

_____

[5]While the court has made its position clear regarding whether it would permit further discovery, the parties are nevertheless involved in a dispute as to the admissibility of Jeffrey M. Sperry's affidavit.  In any event, the contents of Sperry's affidavit were not pertinent to the resolution of the pending motions.  Still, Sperry's testimony appears to be based on his technical and specialized knowledge and information obtained secondhand from SIC and other industrial property leases.  The calculations central to Sperry's testimony are of the type that require a knowledge and familiarity with factors beyond the ken of the average layperson.  *See United States v. Ganier*, 468 F.3d 920, 925-26 (6th Cir. 2006).  Such testimony as to reasonable rental value is normally left to the province of expert witnesses.  *See* FED. R. EVID. 702; *see, e.g.*, *James Neff Kramper Family Farm P'ship v. IBP, Inc.*, 393 F.3d 828, 831 (8th Cir. 2005) (rental value of land); *Pajaro Dunes Rental Agency, Inc. v. Pajaro Dunes Assoc.*, 73 Fed. Appx. 953, 955 (9th Cir. 2003) (rental value of a building); *Heydt v. United States*, 38 Fed. Cl. 286, 310 (1997) (rental value of property).

resolved at this juncture, the parties' motions for summary judgment are

denied as to SIC's use and occupancy claim.

## B.   <u>Navigation Law</u>

Under N.Y. NAV. LAW § 181, or the Oil Spill Act, "[a]ny person[6] who

has discharged petroleum shall be strictly liable, without regard to fault, for

all cleanup and removal costs and all direct and indirect damages, no

matter by whom sustained ...."  The term discharge is defined as "any

intentional or unintentional action or omission resulting in the releasing,

spilling, leaking, pumping, pouring, emitting, emptying or dumping of

petroleum" into state waters or onto land from which the petroleum might

flow or drain into state waters, including surface or groundwater.  N.Y. NAV.

LAW §§ 172(8), 172(18).  "'Petroleum' means oil or petroleum of any kind

and in any form, but not limited to, oil, petroleum, fuel oil, oil sludge, oil

refuse, oil mixed with other wastes and crude oils, gasoline and kerosene."

N.Y. NAV. LAW § 172(15).  "Cleanup and removal" encompasses actions

taken to contain or attempt to contain a discharge, remove or attempt to

remove a discharge, or prevent or mitigate damages to the public health,

---

[6]"Person" includes public or private corporations, companies, associations, firms, partnerships, joint stock companies, and individuals.  *See* N.Y. NAV. LAW § 172(14).

safety, or welfare.  N.Y. NAV. LAW § 172(4).

Because N.Y. NAV. LAW § 181 is remedial in nature, it should be liberally construed.  *See Bologna v. Kerr-McGee Corp.*, 95 F. Supp.2d 197, 202-03 (S.D.N.Y. 2000).  Accordingly, where a property owner did not cause or contribute to the discharge, he may bring an action "against the person who has discharged the petroleum" to recover reimbursement for the costs of cleanup and removal, and direct and indirect damages based on strict liability.  N.Y. NAV. LAW §§ 172(3), 181(5); *see also White v. Long*, 85 N.Y.2d 564, 569 (N.Y. 1995).  Thus, a faultless owner of contaminated lands who is considered a "discharger" under § 181(1) "should not be precluded from suing those who have actually caused or contributed to such damage."  *White*, 85 N.Y.2d at 569; *see also New York v. Green*, 96 N.Y.2d 403, 408 (N.Y. 2001).

Even if the property owner caused or contributed to the discharge, he may still seek contribution from any other party who is responsible and therefore liable for the discharge.  *See Booth Oil Site Admin. Group v. Safety-Kleen Corp.*, 532 F. Supp.2d 477, 511 (W.D.N.Y. 2007).  N.Y. NAV. LAW § 176(8) provides that "every person providing cleanup [or] removal of discharge ... shall be entitled to contribution from any other responsible

19

party."  To prevail under § 176(8), a property owner must establish that the party from whom he is seeking contribution reasonably knew that petroleum was present on the property and was responsible for its discharge.  *See Dora Homes, Inc. v. Epperson*, 344 F. Supp.2d 875, 892 (E.D.N.Y. 2004).

As a threshold matter, SIC has sufficiently alleged the grounds upon which its Navigation Law claim rests.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  Specifically, SIC alleges that Safer and Upstate possessed and abandoned petroleum-based materials at the Nott Street Building site and that this abandonment constituted a threat to the New York State environment.  (*See* Am. Compl. ¶¶ 40-44, Dkt. No. 66.)  SIC further alleges that it was required to engage in cleanup, removal, and disposal of the petroleum, the cost for which Safer and Upstate should be liable.  (*See id.* at ¶ 45.)  However, though this is sufficient to withstand a motion to dismiss under FED. R. CIV. P. 12(b)(6), the court must still evaluate whether any genuine issues of material fact remain that would preclude judgment as a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

Having reviewed the record, the court denies the parties' motions for

summary judgment due to the existence of genuine issues of material fact.

In particular, while it is clear that Upstate and Safer are "persons" within the

definition of § 172 and that SIC incurred "cleanup and removal" costs

consistent with § 181, it is disputed as to whether and to what extent

Upstate and/or Safer contributed to or caused the discharge of petroleum

in and around the Nott Street Buildings during their use and occupancy.

While Upstate and Safer claim that they did not possess most of the

petroleum products at the Nott Street Buildings and that there is no proof of

discharge or spillage, the former claim seems somewhat dubious and of no

consequence, and the latter claim is refuted by the documentary evidence

and testimony provided by Frantzen.  Furthermore, while Upstate and

Safer's representative, Brian Winning, contends that Upstate and Safer

were not aware of any oil being located or handled at the Nott Street

facilities, (*see* Winning Aff. ¶¶ 4-7, Dkt. No. 84:4), SIC has provided

sufficient evidence to contradict those assertions.  The contents of the

letters exchanged between Deily, on behalf of SIC, and Neuer, on behalf of

Upstate and Safer, combined with the circumstantial evidence would allow

a reasonable jury to find that Upstate and Safer had the requisite

knowledge that petroleum-based substances were present at the Nott

Street Buildings.  Therefore, for these reasons, the court denies the parties'

motions for summary judgment on SIC's Navigation Law claim.

## C.   CERCLA

"CERCLA is a comprehensive federal law governing the remediation

of sites contaminated with pollutants."  *Consol. Edison of N.Y., Inc. v. UGI*

*Utils., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005).  CERCLA's purpose is to

"encourage the timely cleanup of hazardous waste sites" and to "place the

cost of that cleanup on those responsible for creating or maintaining the

hazardous condition."  *W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.*, 559

F.3d 85, 88 (2d Cir. 2009) (internal quotation marks and citation omitted).

With this purpose in mind, CERCLA "encourage[s] private parties to

assume the financial responsibility of cleanup by allowing them to seek

recovery from others."  *Key Tronic Corp. v. United States*, 511 U.S. 809,

819 n.13 (1994) (internal quotation and citation omitted).  Thus, under 42

U.S.C. § 9607(a), a potentially responsible party (PRP) may bring suit

against other PRPs to recover costs and damages incurred in cleaning up

a contaminated site.  *See United States v. Atl. Research Corp.*, 551 U.S.

128, 139 (2007); *see also Consol. Edison of N.Y., Inc.*, 423 F.3d at 94.

To make out a prima facie cause of action under CERCLA, a plaintiff

must establish that: (1) the defendant is a PRP; (2) the site is a facility[7]; (3) there was a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs in responding to the release or threatened release; and (5) the costs and response actions conform to the national contingency plan under CERCLA.  *See B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992).  A PRP includes "any person[8] who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of ...."  42 U.S.C. §§ 9601(20)(A), 9607(a)(2); *see also Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 178 (2d Cir. 2003).  "Operator" status is evaluated according to "the degree of control a party is able to exert over the activity causing the pollution," *Prisco v. New York*, 902 F. Supp. 400, 406 (S.D.N.Y. 1995), whereby liability attaches "if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment," *Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1340 (9th

---

[7]A "facility" is "(A) any building, structure, installation, equipment ...or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located ...."  42 U.S.C. § 9601(9).

[8]"Person" includes any "individual, firm, corporation, association, partnership, consortium, joint venture, [or] commercial entity ...."  42 U.S.C. § 9601(21).

Cir. 1992).  The term "hazardous substance" expansively covers any substance enumerated in Table 302.4 of 40 C.F.R. § 302.4 or any substance designated pursuant to 33 U.S.C. § 1317(a) or § 1321(b)(2)(A), or 42 U.S.C. § 6921, § 7412, or § 9602.  *See* 42 U.S.C. § 9601(14); *see also Murtha*, 958 F.2d at 1200-01.  The extent to which a hazardous substance is present and its concentration is irrelevant to deciding CERCLA liability.  *See Murtha*, 958 F.2d at 1200.  The definition of "disposal" is derived from 42 U.S.C. § 9603(3) and includes "the discharge, deposit, injection, dumping, spilling, leaking, or placing of" hazardous waste into or onto any land or water.  *See Jones Chem., Inc.*, 315 F.3d at 178. Similarly, the release of a hazardous substance occurs where there is "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment ... [or] abandoning or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant."  42 U.S.C. § 9601(22).

In general, "response costs are liberally construed," *W.R. Grace & Co.-Conn.*, 559 F.3d at 92, so as to cover any necessary actions taken to clean up, remove, or dispose of any hazardous substances, to monitor,

24

assess, and evaluate the release of hazardous substances, or to remedy,
prevent, minimize, or confine the release of hazardous substances. *See*
42 U.S.C. § 9601(23)-(25). The fact that a PRP engages in removal and
remedial actions voluntarily, by prior agreement, or pursuant to a consent
order is of "no legal significance" as to whether that party has incurred
response costs. *W.R. Grace & Co.-Conn.*, 559 F.3d at 92-93. However,
the plaintiff must demonstrate that the response costs incurred were
necessary and consistent with the national contingency plan. *See* 42
U.S.C. § 9607(a)(4)(B). "Consistency" can be established where a state
environmental agency approves of the cleanup plan and monitors the
remediation process, and the cleanup is performed in accordance with the
agency's requirements. *See NutraSweet Co. v. X-L Eng'g*, 227 F.3d 776,
791 (7th Cir. 2000); *see also Pfohl Bros. Landfill Site Steering Comm. v.
Browning-Ferris Indus. of N.Y., Inc.*, No. 95-CV-956A(F), 2004 WL 941816,
at *22-23 (W.D.N.Y. Jan. 30, 2004); 40 C.F.R. § 300.700(c)(3).

     Preliminarily, the court is satisfied that SIC has met its Rule 12(b)(6)
burden by alleging a prima facie cause of action under CERCLA against
both Safer and Upstate. *See ATSI Commc'ns, Inc.*, 493 F.3d at 98. In
essence, SIC alleges that Safer and Upstate fit within the definition of a

"person" under CERCLA, that they were "operators" of the Nott Street

facility, that there was a release of hazardous substances at that facility

during the time of operation, and that SIC incurred response costs that

were necessary and in conformity with the national contingency plan.  (*See*

Am. Compl. ¶¶ 47-57, Dkt. No. 66.)  Yet, as to the parties' competing

motions for summary judgment, genuine issues of material fact remain.

    For the first and second elements of a CERCLA claim, SIC has

demonstrated that Upstate and Safer are persons under 42 U.S.C. §

9601(21), and that the Nott Street Buildings constitute a facility under either

subsection (A) or (B) of § 9601(9).  Though the relationship between Safer

and Upstate is rather nebulous, and is further blurred by defendants'

submissions,[9] SIC has provided adequate evidence to create a genuine

issue of fact regarding whether Upstate and Safer are liable as PRPs

based on their status as operators of the Nott Street facility.  The evidence

_____

[9]Defense counsel for Upstate and Safer alleges that Safer merely acted as a nominee or accommodation purchaser for Upstate.  (*See* Oct. 23, 2008 Minute Entry, Dkt. No. 62; Def. Answer ¶ 65, Dkt. No. 67.)  This would suggest that Safer was either nominated or created by Upstate to purchase from CommerceWest the property enumerated in the February 9 Bill of Sale.  However, while it is undisputed that Safer transferred this property to Upstate shortly after February 9, 2005, it appears that Safer's involvement at the Nott Street facility did not end there.  Winning's testimony suggests that while employed by Safer he performed services for Upstate.  (*See* Winning Aff. ¶¶ 1-3, Dkt. No. 84:4.)  Frantzen's testimony and his August 25, 2005 memo suggest the same, namely that Winning was the individual responsible for decommissioning the Nott Street facilities during the period Upstate had possession.  (*See* Frantzen Aff., Ex. G, Dkt. No. 72:12.)  And the briefs, affidavits, and other evidence submitted by defendants do not distinguish between Upstate and Safer in any appreciable way.

is such that a reasonable factfinder could conclude that Upstate and/or Safer exercised control over substances that are considered hazardous under 42 U.S.C. § 9601(14) and that during that time Upstate and/or Safer disposed of and released these hazardous substances.  Specifically, among the substances present at the Nott Street facility were ammonium hydroxide, ammonium sulfite, methylene chloride/two-butoxyethanol, potassium hydroxide, sodium bisulfite, sodium hydroxide, all of which are specifically listed in Table 302.4 of 40 C.F.R. § 302.4, two-ethylhexanol, lime, and other miscellaneous solvents, dyes, pigments, cleaners, acids, bases, and resins.  (*See* Frantzen Aff., Exs. E, G, H, I, J, Dkt. Nos. 72:12-13.)  These findings were supported by the DEC's reports, which also included the presence of methylene chloride, spill residue, spent fluorescent lamps, and other potentially ignitable, corrosive, or toxic waste. (*See* Frantzen Aff., Ex. B, Dkt. No. 72:11.)  Accordingly, a reasonable trier of fact could find that Upstate and/or Safer released any or all of these hazardous substances by spilling, leaking, disposing, or abandoning them in and around the Nott Street facility.

SIC has further demonstrated a triable issue as to the costs it incurred in responding to the release and threatened release of hazardous

substances at the Nott Street facility.  In contrast to Upstate and Safer's

vague, conclusory arguments, SIC has provided copious and detailed

documentation of the costs incurred in monitoring, assessing, confining,

identifying, cleaning up, removing, and disposing of the hazardous

substances that were released and abandoned at the Nott Street site.  And

in satisfying the final element of a CERCLA claim, SIC has adequately

demonstrated that these response costs may have been necessary and

consistent with the national contingency plan based on the DEC's

involvement, monitoring, and approval.  Therefore, based on the above-

discussed disputes of fact, the parties' summary judgment motions

regarding SIC's CERCLA claim are denied.

**D.**     **Private Nuisance**

While SIC did not move for summary judgment on its private

nuisance claim, SIC has failed to provide any response to Upstate and

Safer's cross-motion for summary judgment on this claim.  (*Compare* Def.

Mem. of Law at 13, *with* Pl. Reply Mem. of Law, Dkt. No. 86.)  Based on

this lack of support for—or even acknowledgment of—its private nuisance

claim, the court may deem it abandoned.  *See Maher v. Alliance Mortg.*

*Banking Corp.*, No. 06-CV-5073, 2009 WL 2827682, at *13-14 (E.D.N.Y.

Sept. 3, 2009) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

Moreover, on its face, the private nuisance claim must fail because the source of the alleged nuisance existed on SIC's own property. *See Rose v. Grumman Aerospace Corp.*, 196 A.D.2d 861, 862 (2d Dep't 1993) ("Because the injury complained of was to the same property as that on which the nuisance was alleged to exist, the plaintiff's nuisance cause of action should have been dismissed.") (citation omitted). In other words, since the nuisance arose on SIC's property, the requisite invasion needed to maintain a private nuisance cause of action is absent. *See Chase Manhattan Bank, N.A. v. T&N PLC*, 905 F. Supp. 107, 125-26 (S.D.N.Y. 1995); *see also Scribner v. Summers*, 84 F.3d 554, 559 (2d Cir. 1996). Therefore, for these reasons, SIC's private nuisance claim is dismissed.

**E.   Sanctions**

A court has authority to sanction a party under Rule 11(c) if it determines that the party has made false, misleading, improper, or frivolous representations to the court in violation of Rule 11(b). *See Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 51 (2d Cir. 2008).

However, "[a] motion for sanctions must be made separately from any other motion."  FED. R. CIV. P. 11(c)(2).  "Further, the motion must first be served upon the offending party, who is then given 21 days to remedy the sanctionable conduct before the motion may be made to the court."  *Finnan v. Ryan*, No. 8:08-CV-259, 2008 WL 4891162, at *7 (N.D.N.Y. Nov. 7, 2008).  Compliance with these procedural prerequisites is mandatory.  *See Williamson*, 542 F.3d at 51-52; *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1328-29 (2d Cir. 1995).

Here, it is readily apparent that Upstate and Safer have failed to satisfy the Rule 11 requirements.  First, the request for sanctions was not filed separately from their motion for summary judgment.  Second, as SIC verifies, Upstate and Safer did not serve SIC with a copy of the motion for sanctions at least 21 days prior to filing it with the court, but rather served SIC with the motion on the day it was filed with the court, June 29, 2009.  The two letters sent by defense counsel to SIC on May 6 and May 22, 2009, warning of Upstate and Safer's intentions to move for sanctions under Rule 11 are not a valid substitute for service of a copy of the actual motion 21 days before it is filed with the court.  *See Roth v. Green*, 466 F.3d 1179, 1192 (10th Cir. 2006).  Therefore, without reaching the merits of

30

the motion, the court denies Upstate and Safer's motion for sanctions due to their failure to comply with the requirements of Rule 11.  And because the court has not reached the merits of Upstate and Safer's motion for sanctions, the court cannot determine whether it was frivolous. Accordingly, SIC's counter-request for attorneys' fees and expenses incurred in responding to the Rule 11 motion is denied.

## IV. <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that SIC's motion for summary judgment (Dkt. No. 72) is **DENIED**; and it is further

**ORDERED** that Upstate and Safer's cross-motion for summary judgment (Dkt. No. 83) is **GRANTED** in part as to SIC's private nuisance claim, which is accordingly dismissed; and it is further

**ORDERED** that Upstate and Safer's cross-motion for summary judgment is **DENIED** as to SIC's remaining claims; and it is further

**ORDERED** that all motions for sanctions are **DENIED**; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

January 25, 2010
Albany, New York

_____
United States District Court Judge